IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                         **Case No. 11-40073-01-RDR**

MARK P. COLLIER,

        Defendant.

## **MEMORANDUM AND ORDER**

This matter is presently before the court upon defendant Mark P. Collier's motion to suppress. The court has heard evidence and is now prepared to rule.

Collier is charged with possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g). The charge arose following a <u>Terry</u> stop after a 9-1-1 call suggesting suspicious activity at a Topeka residence.

Collier raises two arguments in his motion to suppress. First, he contends he was unlawfully stopped because the police officer did not have reasonable suspicion to believe that he was involved in criminal activity. Second, he asserts his continued detention was unlawful because the officers learned prior to seeking consent to search the vehicle he was driving that there was no reasonable suspicion he was involved in criminal activity. Based upon these arguments, he contends the discovery of the firearm in the vehicle and the statements he made after the

discovery of the firearm should be suppressed under the fruit-of-the-poisonous-tree doctrine. The government has responded that (1) the police officer had reasonable suspicion to stop the vehicle based on a citizen-informant's report; (2) the police officer lawfully detained Collier until he obtained consent to search the van; and (3) even if the police officer unlawfully detained Collier at the time he searched the van, suppression is not required. With regard to the last argument, the government contends initially that the defendant's alleged unlawful detention was not the but-for cause of the search. Moreover, the government argues that suppression should also be denied because the evidence would have been inevitably discovered.

**Findings of Fact**

1. On May 27, 2011, someone called 9-1-1 to report suspicious activity at a residence located at 1301 NE Arter Avenue in Topeka, Kansas. The caller indicated she lived across the street from that residence. She told the dispatcher that two young, white males were at the house and were taking pictures, trying to open outside doors to the residence, and getting ready to mow the grass. She indicated that the tenant had told her that the house had been robbed recently by someone driving a white van pulling a trailer. The caller said that the tenant told her that no one should be at her house to mow the grass. She described the actions of the two individuals to the 9-1-1 dispatcher as they were happening. The

caller told the dispatcher that police officers should hurry to the residence. She indicated that the two men were driving a white panel van that was pulling a trailer. She provided the 9-1-1 dispatcher with her telephone number but refused to provide her name. The 9-1-1 dispatcher summoned Topeka Police Department (TPD) officers to the residence at approximately 5:46 p.m. The dispatch report indicated that the nature of the incident was a "prowler."

    2. Chris Sturgeon, a corporal with the TPD, received the dispatch information. He was on routine patrol in the area of the residence in a marked TPD patrol car. Within minutes of receiving the dispatch, he noticed a white van pulling a trailer carrying a lawn mower. The van was only a few blocks from the 1301 NE Arter Avenue location. He initiated a car stop by activating his emergency lights at approximately 5:49 p.m.

    3. Robert Sachs, another TPD officer who was also in the area, received the dispatch and proceeded to the residence. Before he arrived, Corporal Sturgeon informed him that he had stopped a white van pulling a trailer. He told Officer Sachs to continue to the residence. Officer Sachs checked the residence and found no forced entry. He subsequently provided this information to Corporal Sturgeon. Officer Sachs also learned from another officer while he was en route to the location that a burglary had occurred at that residence several weeks ago.

    4. After Corporal Sturgeon initiated his emergency lights on

his patrol car, the van immediately pulled to the side of the road. Corporal Sturgeon approached the van and saw two white males in the van. He requested identification from both of them. The driver was Mark P. Collier and the passenger was Tyson Gibson. Corporal Sturgeon recognized Collier. He was immediately suspicious because he had previously received information from TPD intelligence that Collier was a thief and burglar. Corporal Sturgeon was told by the van's occupants that they worked for TLC Lawn Care. They confirmed that they had been at the residence at 1301 NE Arter Avenue. They told Corporal Sturgeon that their supervisor was Mike Damman and provided his phone number. They said their jobs consisted of taking care of houses that were in foreclosure. At each location, they were responsible for mowing the lawn, taking pictures, and noting any damage. They also put key locks on the door knobs.

5. Corporal Sturgeon returned to his car and began to evaluate the situation. He sought information from his dispatcher on the van and the individuals in it. He was later informed by his dispatcher that the information on the van and its occupants was negative. He called the individual who had made the original phone call to 9-1-1. This person lived across the street from 1301 NE Arter Avenue. She told Corporal Sturgeon that the person who lived at the residence had told her to be on the lookout for suspicious activity. She also said that the tenant of the residence had said to call the police if a van with a trailer arrived because the

tenant believed that property had been stolen in the past and a van with a trailer had been involved. Corporal Sturgeon then called the tenant, Candi Boston. Ms. Boston told him that she had not hired anyone to cut the grass. She said that no one should be at the house. Corporal Sturgeon also attempted to call the owner of the house, but he was unable make contact.

6. Corporal Sturgeon next called Damman, the TLC Lawn Care supervisor. He was also the owner of the van. He confirmed what the occupants of the van had told him. He informed Corporal Sturgeon that TLC had been hired by Safeguard Properties to do work at 1301 NE Arter Avenue. Corporal Sturgeon asked him if he could search the van and Damman gave consent to search the van. Corporal Sturgeon then called Safeguard Properties. He was advised that TLC should not have been there because they were unaware that the tenant was still living there. The individual at Safeguard Properties acknowledged that a "stop order" should have been issued, but it had not been done. Corporal Sturgeon believed at that time that TLC had authorization to be at the residence at 1301 NE Arter Avenue despite the mix-up about the tenant.

7. Officer Sachs had arrived at the scene of the traffic stop by this time. Corporal Sturgeon had the individuals in the van exit the van and stand at its rear. They were being detained at that time. Pursuant to Damman's consent, Corporal Sturgeon began to conduct a search of the van. He immediately saw a red and white

cooler just behind the front seats.  He opened the cooler and saw a handgun sitting on top of the ice in it.  He seized the gun.  He then arrested Collier and Gibson.  Collier provided a statement to Officer Sachs about how he had acquired the gun.  He told him that he had found the gun at a vacant residence and decided to keep it.  Corporal Sturgeon later learned that Collier was a felon.

**Conclusions of Law**

1.   The Fourth Amendment protects individuals from "unreasonable searches and seizures," U.S. Const. amend. IV, including unreasonable "investigatory stop[s]" or detentions. United States v. Simpson, 609 F.3d 1140, 1146 (10th Cir. 2010).  In Terry v. Ohio, the Supreme Court established that a law enforcement officer "may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to arrest."  United States v. Treto-Haro, 287 F.3d 1000, 1004 (10th Cir. 2002) (quoting Terry v. Ohio, 392 U.S. 1, 22 (1968)) (internal quotation marks omitted). An investigatory detention "is justified at its inception if 'the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime.'" United States v. DeJear, 552 F.3d 1196, 1200 (10th Cir.) (quoting United States v. Werking, 915 F.2d 1404, 1407 (10th Cir. 1990)), cert. denied, 129 S.Ct. 2418 (2009); see also United States v.

Sokolow, 490 U.S. 1, 7 (1989) ("[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion . . . that criminal activity 'may be afoot,' even if the officer lacks probable cause." (quoting Terry, 392 U.S. at 30)). Although "[r]easonable suspicion requires the officer to act on 'something more than an inchoate and unparticularized suspicion or hunch,'" United States v. Hauk, 412 F.3d 1179, 1186 (10th Cir. 2005) (quoting Sokolow, 490 U.S. at 7), "the level of suspicion required for reasonable suspicion is 'considerably less' than proof by a preponderance of the evidence or that required for probable cause." United States v. Lopez, 518 F.3d 790, 799 (10th Cir. 2008) (quoting Sokolow, 490 U.S. at 7).

2. In determining whether reasonable suspicion exists, the court looks to the "totality of the circumstances," rather than assessing each factor or piece of evidence in isolation. United States v. Salazar, 609 F.3d 1059, 1068 (10th Cir. 2010). Additionally, we "need not rule out the possibility of innocent conduct," United States v. Arvizu, 534 U.S. 266, 277 (2002), and reasonable suspicion may exist "even if it is more likely than not that the individual is not involved in any illegality." United States v. Albert, 579 F.3d 1188, 1197 (10th Cir. 2009) (quoting Johnson, 364 F.3d 1185, 1194 (10th Cir. 2004)) (internal quotation marks omitted). "All reasonable suspicion requires is 'some minimal level of objective justification.'" Id.(quoting Sokolow,

7

490 U.S. at 7).

3. Furthermore, when determining if a detention is supported by reasonable suspicion, we "defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." United States v. Zubia-Melendez, 263 F.3d 1155, 1162 (10th Cir. 2001) (internal quotation marks omitted). We "judge the officer's conduct in light of common sense and ordinary human experience," United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997), and "we consider the reasonableness of an officer's actions using an 'objective standard.'" United States v. Winder, 557 F.3d 1129, 1134 (10th Cir.) (quoting United States v. Sanchez, 519 F.3d 1208, 1213 (10th Cir. 2008)), cert. denied, 129 S.Ct. 2881 (2009). The detaining officer's "'subjective beliefs and intentions' are, quite simply, irrelevant." Id. (quoting United States v. DeGasso, 369 F.3d 1139, 1143 (10th Cir. 2004)). Under this objective standard, we ask "whether 'the facts available' to the detaining officer, at the time, warranted an officer of 'reasonable caution' in believing 'the action taken was appropriate.'" Id.(quoting Terry, 392 U.S. at 21-22). When the officer has stopped a person based on reasonable suspicion of criminal activity, the officer may briefly detain the individual "in order to determine his identity or to maintain the status quo momentarily while obtaining more information." Adams v. Williams, 407 U.S. 143, 146 (1972).

4. "Anonymous tips raise difficult Fourth Amendment questions.

8

In contrast to information obtained from a known informant, an anonymous tip rarely allows authorities to assess the informant's veracity, reliability, or basis of knowledge." United States v. Copening, 506 F.3d 1241, 1246 (10th Cir. 2007). Nevertheless, "there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." Florida v. J.L., 529 U.S. 266, 270 (2000) (internal quotation marks omitted). The inquiry is case-specific, but relevant factors include: (1) whether the informant lacked "true anonymity" ( i.e., whether the police knew some details about the informant or had means to discover them); (2) whether the informant reported contemporaneous, first-hand knowledge; (3) the informant's stated motivation for reporting the information; and (4) whether the police were able to corroborate information provided by the informant. See United States v. Brown, 496 F.3d 1070, 1079 (10th Cir. 2007) (considering these factors and concluding that information from an anonymous informant was sufficiently reliable to establish reasonable suspicion).

  5. The government has suggested that Corporal Sturgeon had reasonable suspicion to stop and detain Collier because the 9-1-1 report furnished both sufficient indicia of reliability and sufficient information to provide reasonable suspicion that criminal conduct is, has, or is about to occur. The court agrees.

9

Based upon a totality of circumstances, Corporal Sturgeon had reasonable suspicion to stop the van. The information provided by the 9-1-1 caller and relayed to Corporal Sturgeon was sufficient to establish reasonable suspicion. The tip bore sufficient indicia of reliability because (1) the informant lacked "true anonymity" since she had provided her telephone number to the police; (2) the informant was reporting contemporaneous first-hand knowledge of the events as they were transpiring; (3) the informant's motivation was to prevent her neighbor's house from being burglarized; and (4) the police corroborated some of the informant's information, such as the reported information that the two men on the property were driving a white van that was pulling a trailer. The tip also provided sufficient information that criminal conduct was occurring or was about to occur. The court reaches this conclusion with the thought that the level of suspicion required for reasonable suspicion is considerably less than a preponderance of the evidence. The facts available to Corporal Sturgeon were such that they warranted an officer of reasonable caution in believing the action taken was appropriate.

6. The court is also convinced that at the time Corporal Sturgeon received consent to search the van he had reasonable suspicion to stop and detain the individuals in the van. Even if the information that he later learned dispelled that reasonable suspicion, he still had the right to search the van based upon the

10

consent he received from Damman. Based upon the testimony offered at the hearing, the court is not persuaded that Corporal Sturgeon's suspicions were ever entirely dispelled. The statements made by the tenant that no one was to be at her house, coupled with Corporal Sturgeon's knowledge that Collier was a known burglar and thief, provided reasonable suspicion of criminal activity based upon a totality of the circumstances. The court admits that Corporal Sturgeon's testimony on the issue of continued reasonable suspicion was not entirely clear. Nevertheless, he certainly had the authority to search the van while he possessed reasonable suspicion. He did not clarify Collier's presence at 1301 NE Arter Avenue until after he received consent to search the van.

    7. Even if Collier was illegally detained for a brief period of time, this detention does not require suppression of the firearm. Suppression of the firearm under the fruit-of-the-poisonous-tree doctrine is not required because Collier cannot demonstrate a nexus between his unlawful detention and the discovery of the firearm that he now seeks to suppress. Evidence will not be suppressed as fruit of the poisonous tree unless an unlawful search is at least the but-for cause of its discovery. Hudson v. Michigan, 547 U.S. 586 (2006). Even then, causation is often so attenuated that suppression is not justified. Id.; Wong Sun v. United States, 371 U.S. 471, 487-88 (1963). The but-for relationship has been described as a "factual nexus between the

illegality and the challenged evidence." <u>United States v. Nava-Ramirez</u>, 210 F.3d 1128, 1131 (10th Cir. 2000). To establish the factual nexus, at a minimum, "a defendant must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct." <u>Id</u>.

8. There is no such evidence here. During a lawful <u>Terry</u> stop, Corporal Sturgeon asked for permission from the owner of the van to search it. Damman gave valid consent to search the van. At that time, Corporal Sturgeon had consent to search the van and anything he found in the van should not be suppressed even if Corporal Sturgeon later discovered information that dispelled the initial reason for stopping the van. Any unlawful detention of Collier did not lead to the discovery of the firearm. The seizure of the firearm was not fruit of an unlawful detention.

9. The court shall also deny Collier's motion to suppress the statements made following his arrest. Collier has made no effort to argue that his arrest was unlawful if the seizure of the firearm was lawful. Since the statements were made following the arrest, the court finds no basis to suppress the statements. Again, the statements were not the product of Collier's illegal detention.

In sum, Collier's motion to suppress (Doc. #15) shall be denied.

**IT IS SO ORDERED.**

Dated this 2nd day of December, 2011 at Topeka, Kansas.

                                                s/Richard D. Rogers
                                                United States District Judge